## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **PHILLIP SEALS** | **CIVIL ACTION** |
| **VERSUS** | **NO. 12-1983** |
| **SHELL OIL COMPANY et al.** | **SECTION: "G"(4)** |

### ORDER AND REASONS

Before the Court is Defendant Shell Oil Company's ("Shell" or "Defendant") Motion for Summary Judgment,[1] Plaintiff Phillip Seals's ("Seals" or "Plaintiff") Motion for Summary Judgment on Liability of Shell Offshore Company for Vessel Negligence,[2] and Defendant Shell's Cross-Motion for Summary Judgment.[3] This litigation arises out of a fall from a ladder that occurred on December 23, 2010 on the PERDIDO platform, located in the Gulf of Mexico approximately 200 miles off the coast of Texas. Plaintiff Seals, who was assigned to work on Defendant Shell Oil Company's platform, claims to have sustained injuries as a result of his fall from a ladder while inspecting the PERDIDO'S enclosed life boat termed the Fast Rescue Craft.[4]

This Order will decide Defendant Shell's Motion for Summary Judgment, Plaintiff Seals's Motion for Summary Judgment on Liability of Shell Offshore Company for Vessel Negligence, and Defendant Shell's Cross-Motion for Summary Judgment. After considering the motions, the memoranda in support, the memoranda in opposition, the record, and the applicable law, the Court will deny all three of the motions: Defendant Shell's Motion for Summary Judgment, Plaintiff Seals'

---

[1] Rec. Doc. 94.

[2] Rec. Doc 96.

[3] Rec. Doc. 124.

[4] Rec. Doc. 202 at 1.

Motion for Summary Judgment on Liability of Shell Offshore Company for Vessel Negligence, and Defendant Shell's Cross-Motion for Summary Judgment.

## I. Background

### A. Factual Background

This matter arises out of an alleged incident occurring on December 23, 2010, on the Shell PERDIDO platform located two hundred miles off the coast of Texas.[5] Plaintiff was employed as a crane mechanic by Danos & Curole Marine Contractors, LLC ("Danos"), who was initially terminated as a defendant on August 17, 2012 but who has since intervened in the matter. Danos assigned Seals to work on Shell's offshore platform, the PERDIDO, pursuant to an agreement between Shell and Danos.[6] Although Danos assigned Plaintiff to work as a crane mechanic, Plaintiff alleges that Plaintiff was instead directed by Shell to work as a platform mechanic after he arrived on the PERDIDO.[7]

As part of his duties as a platform mechanic, Plaintiff was required to regularly inspect the PERDIDO Fast Rescue Craft, a enclosed life boat that was suspended from the PERDIDO.[8] This required standing on an interior ladder that ran through a hatch of the Fast Rescue Craft and bending over the Fast Rescue Craft's upper shell to unhook a safety line.[9] In doing this, Plaintiff claims that on December 23, 2010, he had to extend himself so far over the Fast Rescue Craft's upper shell that

---

[5] Rec. Doc. 1 at ¶ 2.

[6] *Id.* at ¶ 6; Rec. Doc. 94-1 at 1.

[7] Rec. Doc. 1 at ¶ 7.

[8] *Id.* at ¶ 8; Rec. Doc. 94-1 at 1.

[9] Rec. Doc. 1 at ¶¶ 9, 11.

2

he lost his balance on the interior ladder and fell, severely injuring his neck.[10] From that incident, the present litigation ensued.

### B. Procedural Background

Plaintiff filed this lawsuit on August 1, 2012.[11] Defendant filed the pending Motion for Summary Judgment on June 14, 2013.[12] On June 18, 2013, Plaintiff filed his own Motion for Summary Judgment on Liability of Shell for Vessel Negligence.[13] On June 25, 2013, Plaintiff filed a memorandum in opposition to Defendant's Motion for Summary Judgment.[14] On July 23, 2013, Defendant filed another Motion for Summary Judgment, this one entitled Cross-Motion for Summary Judgment.[15] The next day, July 24, 2013, Defendant filed a memorandum in opposition to Plaintiff's Motion for Summary Judgment.[16] With leave of the Court, Defendant filed a reply on July 29, 2013 to Plaintiff's opposition to Defendant's Motion for Summary Judgment.[17] Also with leave of the Court, on August 2, 2013, Defendant filed a supplemental opposition and supplemental statement of contested facts in support of opposition to Plaintiff's Motion for Summary Judgment.[18] On August 13, 2013, Plaintiff filed a supplemental memorandum in support of Plaintiff's Motion

---

[10] *Id.* at ¶ 11.

[11] Rec. Doc. 1.

[12] Rec. Doc. 94.

[13] Rec. Doc. 96.

[14] Rec. Doc. 110.

[15] Rec. Doc. 124.

[16] Rec. Doc. 128.

[17] Rec. Doc. 141.

[18] Rec. Doc. 149.

for Summary Judgment.[19] On August 28, 2013, Defendant filed a reply in opposition to Plaintiff's supplemental memorandum in support of Plaintiff's Motion for Summary Judgment.[20] Finally, on March 28, 2014, Defendant filed a supplemental memorandum in support of its Cross-Motion for Summary Judgment.[21] Because of the common issues of law, the Court will resolve all three of the pending motions for summary judgment—Defendant's Motion for Summary Judgment, Plaintiff's Motion for Summary Judgment on Liability of Shell for Vessel Negligence, and Defendant's Cross-Motion for Summary Judgment—in a single Order.

## II. Parties' Arguments

### A. Defendant Shell's Motion for Summary Judgment

Defendant Shell argues Plaintiff's claims are barred by Section 1333(b) of the Outer Continental Shelf Land's Act ("OCSLA"), which makes the Longshore and Harbor Worker's Compensation Act ("LHWCA") Plaintiff's exclusive remedy for the injuries he suffered. As Defendant understands Fifth Circuit precedent, in deciding whether OCSLA applies a court is to look to whether the plaintiff's employment furthered mineral development on the Outer Continental Shelf and whether the plaintiff's injuries would have not occurred "but for" his employment.

Here, according to Defendant, both prongs of the OCSLA test are met. Defendant asserts that Plaintiff's alleged injuries occurred on Shell's PERDIDO spar, a work platform secured to the sea floor of the Outer Continental Shelf and which is involved in offshore mineral production in the Gulf of Mexico. Furthermore, according to Defendant, at the time of his injuries, Plaintiff's activities as

---

[19] Rec. Doc. 160.

[20] Rec. Doc. 176.

[21] Rec. Doc. 241.

4

a mechanic were being performed within the course and scope of his employment in furtherance of Shell's drilling operations. Therefore, Defendant argues, "[P]laintiff's alleged incident is governed by OCSLA." Finally, Defendant argues that OCLSA bars Plaintiff from suing Shell because Section 1333(b) of OCLSA makes the LHWCA applicable to incidents that occur on the Outer Continental Shelf. Significantly, under the LHWCA, Plaintiff is barred from bringing this action against Shell, according to Defendant, because the LHWCA states, that: "The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ . . ." An employee, for purposes of the LHWCA, according to Defendant, includes a borrowed employee, which Defendants contends Plaintiff was of Shell during his time on the PERDIDO.

### B. Plaintiff Seals's Motion for Summary Judgment

Seals argues that even if Shell is deemed to be his borrowing employer pursuant to the LHWCA—something Seals disputes—he is still entitled to recover against Shell for vessel negligence. Seals quotes from the Supreme Court case of *Jones & Laughlin Steel Corporation v. Pfeifer,*[22] in which the Supreme Court stated:

> The first sentence of Section [90]5(b) authorizes a longshoreman whose injury is caused by negligence of a vessel to bring a separate action against the vessel as a third Party . . . The second sentence of Section [90]5(b) makes it clear that such a separate action is authorized against the vessel even when there is no independent stevedore and the longshoreman is employed directly by the vessel owner.

According to Seals, Shell committed "vessel negligence" by breaching several duties owed to personnel.  First, Seals asserts that Shell violated the so-called "Turnover Duty" it owed to Seals.

---

[22]  462 U.S. 523, 530

The "Turnover Duty" requires a vessel owner to exercise reasonable care "to turn over a vessel in such condition that an expert and experienced longshoreman, by the exercise of reasonable care, can carry on its operations with reasonable safety to person and property."[23] Seals argues that "Shell negligently turned over the Shell fast rescue craft to Mr. Seals given Shell's conscious knowledge of Mr. Seals' [sic] complete lack of experience as a platform mechanic and with fast rescue craft."[24] Furthermore, Seals alleges that another violation of the "Turnover Duty" occurred when Shell failed "to provide Mr. Seals with safe access to the Shell fast rescue craft. More specifically, Shell had the duty to provide Mr. Seals a means to secure the maintenance pendant from outside the fast rescue craft before boarding"[25]

Second, Seals asserts that Shell violated the so-called "Active Control Duty," which requires that the shipowner exercise reasonable care to prevent injuries to longshoremen in areas that remain under the shipowner's control, although the shipowner is ordinarily deemed entitled to rely upon the longshoreman to discharge his duties in a "workmanlike manner."[26] Shell violated this duty, according to Seals, because "Shell never had the right to rely upon Mr. Seals to discharge his duties in a workmanlike manner without supervision since Shell knew of Mr. Seals' lack of experience."[27]

Finally, Seals contends that Shell violated a vessel owner's duty "to intervene in longshoremen operations if the shipowner becomes aware of a dangerous condition and the

---

[23] Rec. Doc. 96-2 at 10.

[24] Rec. Doc. 96-2 at 12.

[25] Rec. Doc. 96-2 at 13.

[26] *Id.* at 11.

[27] *Id.* at 12.

6

longshoreman's continued operations are so obviously improvident as to present a known, unreasonable risk of harm to the longshoreman."[28] According to Seals, Seal violated this duty by not taking action to correct an unreasonable risk of harm to Seals when he inspected the Fast Rescue craft. According to Seals, the risk of harm was unreasonable because Shell knew Seals was not an experienced platform mechanic, and yet still required him to discharge the duties of a platform mechanic, including the inspection of the Fast Rescue Craft, without properly training him. Moreover, Plaintiffs contend that Shell also knew "how physically difficult and dangerous Shell made pinning the maintenance pendant for workers [which] in turn made Shell's orders to Mr. Seals to stretch out of the [Fast Rescue Craft's] top hatch negligence [sic]."[29]

### C. Plaintiff Seals's Response in Opposition to Shell's Motion for Summary Judgment

Seals argues, first, that he can sue Shell for vessel negligence even if his OCSLA claims are barred because Shell was his borrowing employer. For this proposition, Seals re-quotes the above cited passage from *Jones & Laughlin Steel Corporation v. Pfeifer.*[30] Seals then cites to his Motion for Summary Judgment for his argument as to why Shell is liable under a theory of vessel negligence.

Second, Seals argues that there is a disputed issue of material fact surrounding whether Seals was the borrowed employee of Shell. If Seals was not an employee or borrowed employee of Shell, then the provisions of the LHWCA barring Seal from bringing suit against Shell would not apply. Seals maintains that he "complained about his placement as a platform mechanic and did not

---

[28] *Id.* at 11.

[29] *Id.* at 12.

[30] 462 U.S. 523, 530

voluntarily 'acquiesce' in his new work."[31] According to Seals, he believed that he was to work as a crane mechanic on the Shell PERDIDO platform. However, upon arriving on the PERDIDO, Seals learned that he was to be a platform mechanic and thereafter asked Danos, his formal employer, to "move him to another job where he could work as a crane mechanic."[32] Seals concludes that this disputed issue of material fact precludes the Court from granting summary judgment on the issue of whether Seals was a borrowed employee.

### D. Defendant Shell's Cross-Motion for Summary Judgment

Defendant Shell argues that "Plaintiff cannot bring an action against Shell under §905 of the LHWCA" because "[P]laintiff's claims against Shell are in its capacity as platform owner," and not a vessel owner.[33] This is so, according to Shell, because Plaintiff alleges a design defect in Shell's PERDIDO spar and not in the Fast Rescue Craft.[34] Citing to non-binding authority, Shell argues that "[r]ecent court decisions make it clear that spars, such as the PERDIDO, are platforms not vessels."[35] Accordingly, Shell concludes that Seals cannot maintain his suit under LHWCA § 905(b) against Shell.[36]

Furthermore, Defendant argues that "[e]ven if the Court finds that plaintiff has a cause of action against Shell under the LHWCA, Shell is not liable to plaintiff under §905(b)" because there was no breach of any of the three duties of a vessel owner—the "Turnover Duty," the "Active

---

[31] Rec. Doc. 110 at 8.

[32] *Id.* at 8–9.

[33] Rec. Doc. 124 at 2–3.

[34] *Id.* at 3.

[35] *Id.*

[36] *Id.*

Control Duty," and the "Duty to Intervene"—laid out by the Supreme Court in *Scindia Steam Ship Navigation Company v. De Los Santos*.[37] Regarding the "Turnover Duty," Defendant argues that, "It is clear that the condition of the FRC, including the ladder and the pendant, was open and obvious to plaintiff; therefore Shell had no duty to warn him of any alleged condition."[38] As for the "Active Control Duty," Defendant makes the same argument. Defendant contends that, "[I]t is clear that the condition of the FRC, including the ladder and the pendant, was open and obvious to plaintiff; therefore Shell had no duty to warn him of any alleged condition."[39] Finally, regarding the "Duty to Intervene," Shell maintains that,

> It cannot be argued that Shell had actual knowledge of any hazardous condition that would cause plaintiff to let his foot lose its connection with the ladder because plaintiff never advised his supervisor or complained to Shell that he was having any difficulty keeping his feet on the ladder while connecting or disconnecting the pendent. Shell, therefore, had no duty to intervene.[40]

### E. Defendant Shell's Response in Opposition to Plaintiff Seals's Motion for Summary Judgment

Defendant Shell reiterates its arguments from its Cross-Motion for Summary Judgment that Plaintiff cannot bring suit under LHWCA § 905(b) because "[P]laintiff's claims against Shell are in its capacity as platform owner," and not vessel owner.[41] Additionally, Defendant reiterates its

---

[37] 451 U.S. 156 (1981).

[38] *Id.* at 6.

[39] *Id.* at 7.

[40] *Id.* at 8.

[41] Rec. Doc. 128 at 3.

second argument from its Cross-Motion for Summary Judgment that, in any event, it did not breach any duty it may have owed to Seals as a vessel owner.[42]

### F. Defendant Shells's Reply to Plaintiff Seals's Response to Defendant Shell's Motion for Summary Judgment

Shell argues that it is entitled to summary judgment because Plaintiff's claims are barred under the LHWCA by virtue of Plaintiff having been Shell's borrowed employee. Citing to *Ruiz v. Shell Oil Company*,[43] Defendant asserts that of the nine factors the Fifth Circuit has pointed to in determining whether a worker is a borrowed employee, the most important is an employer's control over the worker.[44] Defendant argues that here, Shell exercised authority over Plaintiff because Plaintiff (1) received his training from Shell employee, Leon Navarro; (2) was supervised by Shell employee Lillard Hill and John Lodge; (3) took all his direction from Shell; (4) received all of his job assignments from Shell; (5) could be "run off the platform" by Shell; (6) answered to Shell while on the PERDIDO; and (7) was told what to do, how to do it, and how much time to spend doing it by Shell.[45]

Moreover, Defendant asserts that Plaintiff acquiesced in his position—one of the nine factors—because "he never complained about performing the inspection of the fast rescue craft . . . nor refused to do so when directed by Shell."[46] Finally, Defendant argues that "[e]ven if plaintiff had complained about performing the inspection of the FRC, not acquiescing to the work situation

---

[42] *Id.* at 5–8.

[43] 413 F.2d 310 (5th Cir. 1969).

[44] *Id.* at 312.

[45] Rec. Doc. 141 at 3–4.

[46] *Id.* at 2.

is only one of the nine factors to be considered," and the other eight factors weigh in favor of finding Plaintiff to have been a borrowed employee.[47]

### G. Defendant Shell's Supplemental Memorandum in Opposition to Plaintiff Seals's Motion for Summary Judgment

Shell reiterates its position that Plaintiff cannot assert a claim of vessel negligence against Shell because "he has not and cannot establish that he maintains a cause of action in maritime tort."[48] Shell reiterates that "courts have clearly established that spars such as the PERDIDO, are platforms," and thus, there is no vessel negligence because there was no vessel involved. As for the possible argument that the Fast Rescue Craft qualifies as a vessel under the LHWCA, Shell characterizes it as "an appurtenance of and attached to the PERDIDO platform suspended well above the water," and, therefore, the alleged incident did not occur on navigable water, as the LHWCA also requires.[49]

Moreover, Shell maintains that a claim for vessel negligence also requires that the activity involved be a traditional maritime activity and that the incident "caused a potentially disruptive impact on maritime commerce."[50] Here, Shell claims that "Shell's [sic] activities on the PERDIDO platform involved the day to day operation of the platform including the inspection and maintenance of all of the platform's equipment including the FRC" and, as such, "cannot be found to be closely related to a maritime activity."[51] In addition, the incident "created no situation that caused any vessel to abandon its mission" so "there is no argument to be made that any part of the alleged incident

---

[47] *Id.*

[48] Rec. Doc. 149 at 2.

[49] *Id.*

[50] *Id.* at 3.

[51] *Id.*

caused a potentially disruptive impact on maritime commerce."[52]

Finally, Defendant reiterates its argument that Plaintiff is suing Shell in its capacity as platform owner and not vessel owner, thereby barring Plaintiff's claims for vessel negligence.[53]

### H. Plaintiff Seals's Supplement Memorandum in Support of Motion for Summary Judgment

Plaintiff Seals argues that Shell "misconstrues" his allegations in his complaint.[54] According to Seals, "Shell represents" that "Plaintiff brought this matter pursuant to [OCSLA] and designated it as one in admiralty pursuant to Rule 9(h) of the Federal Rules of Civil Procedure."[55] However, Plaintiff contends that he "brings his action for damages[] pursuant to the Longshore and Harbor Workers Compensation Act, 33 U.S.C. Section 905(b), et seq., as well as the General Maritime Law."[56] Plaintiff also takes issue with Defendant's assertion that the Fast Rescue Craft was an "appurtenance" because Defendant fails to cite any authority for that proposition.[57] Along those lines, Plaintiff again faults Defendant for not citing authority for its related proposition that Plaintiff cannot bring a claim of vessel negligence under maritime law because "[P]laintiff's injuries occurred in a suspended [Fast Rescue Craft]." According to Plaintiff, "Shell's suspended [Fast Rescue Craft] remains a 'vessel' as defined in 1 U.S.C. § 3.[58]

---

[52] *Id.*

[53] *Id.*

[54] Rec. Doc. 160 at 1.

[55] *Id.* (citations omitted).

[56] *Id.* at 2 (internal quotation marks omitted).

[57] *Id.* at 2–3.

[58] *Id.* at 3.

For support for his argument, Plaintiff cites to *Bonnette v. Shell Offshore, Inc.,*[59] a case that Plaintiff claims examined Shell's "appurtenance" argument. Plaintiff quotes a portion of the court's opinion, which read: "The platform in this case played the role of a dock or pier, to which a vessel fastens itself. The mere fact that a vessel happens to be tied to, dock at, or otherwise attached, to land or a fixed platform does not affect its status as a vessel."[60] Plaintiff also cites to that case for the proposition that Plaintiff's assignment at the time of the accident involved traditional maritime activities:

> There is also no doubt that the maritime law is concerned with the ability of seamen to escape their ships in emergencies . . . . The use of lifeboats and the execution of lifeboat and man-overboard drills are an essential part of maritime activity . . . .[61]

Additionally, Plaintiff argues that the Supreme Court in *Stewart v. Dutra Construction Co.*[62] "rejected Shell's hypothesis that Shell's [Fast Rescue Craft] ceased to be a vessel when suspended from a platform or that the general maritime law does not apply to plaintiff's injuries suffered in a "suspended" FRC."[63] According to Plaintiff, in *Stewart* the Supreme Court held a vessel does not lose its character as a "vessel" unless and until permanently taken out of navigation.[64] Moreover, Plaintiff points out that, under *Stewart*, a vessel need not be in navigation to qualify as a vessel.[65] Rather, according to Plaintiff, "[t]he U.S. Supreme Court held with respect to the 'in navigation'

---

[59]  838 F.Supp. 1175 (S.D. Tex. 1993).

[60]  *Id.* at 1184.

[61]  *Manny L. Nottingham v. Murphy Oil USA, Inc.* (quoting *Bonnette*) (citations not given).

[62]   543 U.S. 481 (2005).

[63]  *Id.* at 4.

[64]  *Id.*

[65]  *Id.* at 5.

requirement for a vessel, a vessel need not be physically moving on water to constitute a vessel at a given moment . . . ."[66] Plaintiff quotes a portion of *Stewart*, which reads:

> Instead, the "in navigation" requirement is an element of the vessel status of a watercraft. It is relevant to whether the craft is "used, or capable of being used" for maritime transportation . . . . The question remains in all cases whether the watercraft's use "as a means of transportation on water" is a practical possibility or merely a theoretical one.[67]

Plaintiff next argues that his injuries were potentially disruptive to maritime commerce. He quotes the Fifth Circuit case of *Coats v. Penrod Drilling Corp.*,[68] wherein the Fifth Circuit held, "Without a doubt, worker injuries, particularly to those involved in repair and maintenance, can have a disruptive impact on maritime commerce by stalling or delaying the primary activity of the vessel."[69]

Finally, Plaintiff argues that maritime jurisdiction begins when a maritime worker boards a platform's lifeboat. Plaintiff returns to *Bonnette* for this proposition. He quotes two passages from *Bonnette*. The first reads, "[T]his Court draws the line between OCSLA and maritime jurisdiction at the point where the platform ends and the escape capsule begins."[70] The second quotation states that maritime law still applies even in cases where "the escape capsule was never successfully launched, and never actively navigated on the high seas."[71]

---

[66] *Id.*

[67] *Id.* at 5–6 (quoting 543 U.S. at 496).

[68] 61 F.3d 1113 (5th Cir. 1995).

[69] *Id.* at 1119.

[70] 838 F.Supp. at 1185.

[71] *Id.*

*I. Defendant Shell's Supplemental Memorandum in Support of Cross-Motion for Summary Judgment*

Shell argues that in *Riley v. Alexander/Ryan Marine Services Company*,[72] "the United States District Court Southern District of Texas decided a [new] case . . . on point with the instant matter," and because the court there found that the platform/spar was not a vessel, that the Fast Rescue Craft in this case cannot qualify as a vessel for the purposes of the LHWCA. Shell contends that, "The implication of the *Riley* decision is that when a person, such as [P]laintiff in the instant matter, is injured on one of a platform/spar's appurtenances, such as the Fast Rescue Craft, he cannot distinguish the appurtenance from the platform/spar when asserting his claims against defendants such as Shell . . ."[73] Shell asks this Court to take notice of that case in ruling on Defendant's Cross-Motion for Summary Judgment,[74] even though the case is only persuasive authority and not controlling authority here.

### III. Law and Analysis

*A. Standard on Motion for Summary Judgment*

Summary judgment is appropriate when the pleadings, the discovery, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[75] When assessing whether a dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing

---

[72]  No. 3:12-CV-00158, 2013 WL 5774872.

[73]  Rec. Doc. 241 at 2.

[74]  Rec. Doc. 241 at 1.

[75]  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

the evidence."[76] All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[77] If the record, as a whole, could not lead a rational trier of fact to find for the non-moving party, then no genuine issue of fact exists and the moving party is entitled to judgment as a matter of law.[78]

## B. Outer Continental Shelf Lands Act

The Outer Continental Shelf Lands Act ("OCSLA") was enacted "to define a body of law applicable to the seabed, the subsoil, and the fixed structures . . . on the outer Continental Shelf."[79] As set forth in 43 U.S.C. §1333(b), OCSLA makes the Longshore and Harbors Workers' Compensation Act ("LHWCA") applicable to incidents that occur on the Outer Continental Shelf. Section 1333(b) states, in pertinent parts:

> With respect to disability or death of an employee resulting from any injury occurring as the result of operations, conducted on the outer Continental Shelf for the purpose of exploring for, developing, removing, or transporting by pipeline the natural resources, or involving rights to the natural resources, of the subsoil and seabed of the outer Continental Shelf compensation shall be payable under the provisions of the Longshore and Harbor Workers' Compensation Act . . . . For the purposes of the extension of the provisions of the Longshore and Harbor Workers' Compensation Act … under this section—
> (1) the term "employee" does not include a master or member of a crew of any vessel, or an officer or employee of the United States or any agency thereof or of any State or foreign government, or of any political subdivision thereof;

The LHWCA states, in pertinent parts:

---

[76] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398-99 (5th Cir. 2008).

[77] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[78] *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

[79] *Rodrigue v. Aetna Cas. and Surety Co.*, 395 U.S. 352, 355–56 (1969).

> The right to compensation or benefits under this Act shall be the exclusive remedy to an employee when he is injured, or to his eligible survivors or legal representatives if he is killed, by the negligence or wrong of any other person or persons in the same employ: Provided, that this provision shall not affect the liability of a person other than an officer or employee of the employer.

Thus, Section 1333(b) of OCSLA makes the LHWCA an injured employee's exclusive remedy against an employer for injuries occurring on a fixed platform on the Outer Continental Shelf.[80] OCSLA's coverage is broad, encompassing compensation for employees injured "as the result of operations conducted on the [O]uter Continental Shelf for the purpose of exploring for, developing, removing, or transporting . . . the natural resources" of the Outer Continental Shelf payable under the LHWCA, which provides a no-fault workers' compensation system for maritime workers.[81]

Significantly, the LHWCA provides that the LHWCA "shall be exclusive and in place of all other liability of such employer to the employee.[82] The LHWCA applies where the maritime worker was an employee or borrowed employee of the platform operator.[83] The LHWCA would not bar an OCSLA claim asserted against a non-employer. Thus, the LHWCA only applies to maritime employees and borrowed maritime employees.

Borrowed employee status is an issue of law.[84] There are nine factors that determine whether an employee is a borrowed employee:

1. Who has control over the employee and the work he is performing, beyond mere suggestions of details or cooperation?

2. Whose work is being performed?

---

[80] *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 375 (1985).

[81] 43 U.S.C. § 1333(b).

[82] 33 U.S.C. § 905(a)

[83] *Alday*, 750 F.2d at 375–76.

[84] *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988).

3. Was there an agreement, understanding, or meeting of the minds between the original and the borrowing employer?

4. Did the employee acquiesce in the new work situation?

5. Did the original employer terminate his relationship with the employee?

6. Who furnished tools and place for performance?

7. Was the new employment over a considerable length of time?

8. Who has the right to discharge the employee?

9. Who had the obligation to pay the employee?[85]

Neither control nor any other single factor is decisive, and no fixed test is used to determine the existence of a borrowed employee-employer relationship for the purposes of the LHWCA.[86] However, the Fifth Circuit has indicated in various cases that "certain of these factors may be more important that others." Thus, the Fifth Circuit has given special weight to such factors as "control over the employee[,] . . . . [t]he furnishing of tools and the place of work, whether the payroll employer has actually terminated his relationship with the employee now working on another's premises, and the duration of the 'borrowing' relationship and the consequent acquiescence or not of the employee."[87] For the Fifth Circuit, these factors "have been regarded as equally significant factors."[88]

---

[85] *Alday*, 750 F.2d at 376.

[86] 765 F.2d 526, 531 (1985).

[87] *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375, 376 (1985).

[88] *Id.*

### C. Negligence Under General Maritime Law

A claim for negligence under general maritime law requires the plaintiff to show that (1) the tort occurred on navigable water or that the injury on land was caused by a vessel on navigable water and (2) the incident had a "potentially disruptive effect on maritime commerce" and that the activity giving rise to the incident has a substantial relationship to traditional maritime activity."[89]

Under *Scindia Steam Ship Navigation Co. v. De Los Santos*,[90] the vessel owner has a duty to exercise:

> Ordinary care under the circumstances to have the ship and its equipment in such a condition that any expert and experienced stevedore will be able by the exercise of reasonable care to carry out its cargo operations with reasonable safety to persons and property, and to warn the stevedore of hazards on the ship or with respect to his equipment that are known to the vessel or should be known in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.[91]

Thus, there are three succinct duties owed to longshoremen: (1) the "Turnover Duty," (2) the "Active-Control Duty," and (3) the "Duty to Intervene."[92] In order to recover under the LHWCA, plaintiff must establish that the vessel owner breached one of these duties owed him and that the breach was a proximate cause of his injury.[93]

---

[89] *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.*, 513 U.S. 527, 534 (1995).

[90] 451 U.S. 156 (1981).

[91] *Id.* at 167.

[92] *Levene v. Pintail Enterprises, Inc.*, 943 F.2d 528, 533 (5th Cir. 1991).

[93] *Id.* at 534.

### 1. The Turnover Duty

Before operations begin, the shipowner must exercise "ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry out its cargo operations with reasonable safety…"[94] The shipowner may rely on stevedores to perform their work with reasonable care, but must warn stevedores of any hazards on the ship or with respect to its equipment that are known to the vessel or should be known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his duties and that are not known to the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.[95] It is well established that the responsibility of a vessel owner to warn of hidden dangers is narrow and does not include dangers, which are open and obvious, or something that a reasonably competent stevedore should anticipate encountering.[96]

### 2. The Active-Control Duty

Once the work begins, the shipowner has no general duty to supervise, inspect, or monitor operations for dangerous conditions that develop during the process, unless required to do so by contract, positive law, or custom.[97] In *Scindia*, the Supreme Court laid out this duty as:

> The shipowner, within limits, is entitled to rely on the stevedore, and owes no duty to the longshoreman to inspect or supervise the cargo operations . . . . . The shipowner can only be liable if it "actively" involves itself in the operations and negligently injures [the employee] or . . . fail[s] to exercise due care to avoid

---

[94] *Scindia*, 451 U.S. at 16l7.

[95] *Kirksey v. Tonghai Maritime*, 535 F.3d 388, 392 (5th Cir. 2008).

[96] *Id.*

[97] *Scindia*, 451 U.S. at 1624.

exposing [the employee] to harm from hazards … encounter[ed] in areas, or from equipment, under the active control of the vessel during the [repair] operation."[98]

This is known as the duty to protect against hazards arising in areas or equipment under the vessel's active control. In line with the Supreme Court's treatment of the Turnover Duty, it is well established that, under the Active-Control Duty, the responsibility of a vessel owner to warn of hidden dangers is narrow and does not include dangers, which are open and obvious, or something that a reasonably competent stevedore should anticipate encountering.[99]

### 3. The Duty to Intervene

The shipowner is entitled to rely on the stevedore's judgment only until the shipowner becomes aware of a hazard on the ship that the stevedore is unreasonably failing to protect the longshoreman against, at which time it has a duty to intervene and remedy the hazard. Although the shipowner is deemed to know about hazards existing before the work begins, it must have actual knowledge of the hazard, which developed during the operations. Vessel owners are subject to the duty only when they have actual knowledge of both a hazard on a ship or with its equipment and a stevedore's improvident decision to proceed despite the unsafe condition.

### D. Whether Summary Judgment Should Be Granted on the Issue of Borrowed Employee Status

The question of whether a maritime worker is a borrowed employee is a question of law.[100] The inquiry, however, is a factually-bound one and involves "nine separate factual inquiries

---

[98]  *Id.* at 169–72.

[99]  535 F.3d at 392.

[100]  *Melancon v. Amoco Prod. Co.*, 834 F.2d 1238, 1244 (5th Cir. 1988)

underlying 'borrowed employee' status."[101] A district court, therefore, must weigh the evidence in considering all nine factors, a task which often precludes summary judgment.[102]

Shell argues that all nine factors weigh in favor of finding that Plaintiff was a borrowed employee, or alternatively, that even conceding that the question of acquiescence is disputed, that the other eight factors weigh so strongly in finding that Plaintiff was a borrowed employee that summary judgment should be granted. In particular, Defendant emphasizes that the question of control is the most important factor in determining whether a worker was a borrowed employee and it is undisputed that Shell exercised control over Seals. Plaintiff, in contrast, contends that the disputed material fact of whether he acquiesced in his employment situation precludes summary judgment.

While the level of control exercised over a worker is an important factor in determining whether a worker was a borrowed employee, this factor is not dispositive. In this case, there are disputed issues of material fact regarding at least two of the factors. Each of these factors has been given as much weight as the question of control by the Fifth Circuit.

The Fifth Circuit case of *West v. Kerr-McGee Corporation*[103] reversed the district court's granting of summary judgment of the defendant's motion for summary judgment on very similar facts in which the same factors were either disputed or weighed against finding the maritime worker to be a borrowed employee. In *West*, the plaintiff worked on a platform as a "pumper" for five

---

[101] *Id.*

[102] *See id.* at 1244–45, 1245 n. 13; *see also West v. Kerr-McGee Corp.*, 765 F.2d 526 (reversing district court's granting of summary judgment because disputed issues of material fact existed); *Alday v. Patterson Truck Line, Inc.*, 750 F.2d 375 (5th Cir. 1985) (reversing district court's granting of summary judgment on same grounds as *West*).

[103] 765 F.2d 526.

months monitoring various gauges and recording data before being injured in a gas explosion.[104]

Here, Plaintiff Seals worked on the PERDIDO platform for seven months before being injured. In

*West,* the corporate defendant—just as did Shell here—provided the plaintiff with all of his

equipment.[105] Additionally, the plaintiff worked under supervision but usually was not directly

supervised while on duty,[106] very similar to Seals's situation here. Significantly, the corporate

defendant in *West* "had the power grant [the plaintiff] leave time, to discipline him, and to dismiss

him from platform," although the corporate defendant "was not authorized to fire [the plaintiff] from

his position with [the plaintiff's payroll employer]."[107] Thus, the level of control the corporate

defendant had over the plaintiff in *West* was similar to the level of control Shell exercised over Seals.

Shell had the power to discipline Seals and run him off the platform, but Shell did not have the

authority to terminate Seals from his position with Danos. Finally, as in the instant case, in *West* the

service contract between the plaintiff's payroll employer and the corporate defendant specifically

provided that the plaintiff should not be deemed for any purpose to be the "employee, agent, servant,

or representative" of the corporate defendant.[108] As Defendant concedes here, the service contract

between Danos and Shell provided that Seals was not at any time to be considered an employee of

Shell.[109]

     The Fifth Circuit in *West* denied the defendant's motion for summary judgment. The Fifth

Circuit cited past precedent that "neither control nor any other single answer to the inquiries is

---

[104] *Id.* at 528.

[105] *Id.*

[106] *Id.*

[107] *Id.*

[108] *Id.*

[109] Rec. Doc. 94-1 at 6.

decisive, and no fixed test is used to determine the existence of a borrowed-servant relationship."[110] Based on this rule of law, the Fifth Circuit reasoned in *West* that, despite the control the corporate defendant exercised over the plaintiff, too many of the other factors were disputed issues of material fact to support a motion for summary judgment, including the fact that the plaintiff's payroll employer paid the plaintiff and provided his LHWCA compensation benefits and that the plaintiff did not participate in any benefit scheme sponsored by the corporate defendant.[111] Moreover, the Court pointed to the fact that although the corporate defendant could dismiss the plaintiff from the platform, it was not empowered to fire the plaintiff from his job with the plaintiff's payroll employer.[112] Finally, of particular importance to the *West* Court was the clause in the contract in which the parties agreed that the plaintiff was not to be deemed an employee of the corporate defendant.[113]

Because of these disputed issues of material fact, the Fifth Circuit reversed the district court's decision to grant the defendant's motion for summary judgment despite the fact that it was undisputed that the corporate defendant had furnished the plaintiff with his tools and "had the power to control [the plaintiff's] actions during his five months on [the platform]."[114] The Fifth Circuit reasoned that "enough conflicting evidence has been surfaced to make summary judgment for the defendant inappropriate."[115]

---

[110]  765 F.2d at 531.

[111]  *Id.*

[112]  *Id.*

[113]  *Id.*

[114]  *Id.*

[115]  *Id.*

Likewise, here, enough conflicting evidence has been brought forth to make summary judgment for Defendant Shell inappropriate on the question of whether Seals was Shell's borrowed employee at the time of the accident. Of particular significance, as in *West* and as was the case in the Fifth Circuit case of *Alday v. Patterson Truck Line, Inc.*,[116] is the clause in the service agreement between Shells and Danos that stipulates that Seals is not to be considered an employee of Shell. While a contractual provision is not determinative of Seals's actual status as an employer, that provision in the service agreement, nonetheless, is conflicting evidence that makes summary judgment inappropriate at this time.

While this Court acknowledges that in the case of *Gaudet v. Exxon Corp.*,[117] the Fifth Circuit affirmed the district court's grant of the defendant's motion for summary judgment on the question of borrowed employee status despite the presence of a like clause in the service contract, the Fifth Circuit found the facts in both *West* and *Alday* distinguishable from the facts in *Gaudet*—and by extension, the facts at issue here distinguishable from *Gaudet*. As the Fifth Circuit explained in *West*, "all factors other than the contract overwhelmingly established the plaintiffs' borrowed-employee status" in *Gaudet*.[118] Notably, the plaintiffs' had worked on the platform in question for 12 years,[119] as opposed to one day in *Alday*, five months in *West*, and seven months here in this case. Moreover, in *Gaudet* the platform owner, Exxon, paid the plaintiffs and could fire the plaintiffs. Those facts again distinguish *Gaudet* from *Alday*, *West*, and this case, where the official employer both paid and retained the authority to fire the plaintiff.

---

[116] 750 F.2d 375 (5th 1985).

[117] 562 F.2d 351 (5th Cir. 1977)

[118] 765 F.2d at 531.

[119] *Id.*

Moreover, the dispute of other material facts precludes summary judgment here. Among others is the question of whether Seals acquiesced to his employment situation. This is a factor that the Fifth Circuit, at times, has found to be equal in importance to the factor of control.[120] Accordingly, the Court finds that the presence of disputed issues of material fact precludes summary judgment on the question of Seals's status as a borrowed employee.

### E. Whether Summary Judgment Should Be Granted on the Issue of Vessel Negligence

Both Defendant and Plaintiff ask this Court to grant summary judgment in their favor on the question of Shell's liability for vessel negligence. Defendant argues that the Fast Rescue Craft cannot serve as a predicate vessel for the purposes of vessel negligence because it was an "appurtenance" of the PERDIDO. The PERDIDO, Defendant argues, is not a vessel for the purposes of vessel negligence under the LHWCA because it is a stationary platform. Moreover, Defendant argues that because the Fast Rescue Craft was suspended above the Gulf of Mexico and was not in the Gulf of Mexico, it was not in navigable water, as the LHWCA also requires. Plaintiff, in contrast, argues that the Fast Rescue Craft does qualify as a vessel, that the Fast Rescue Craft was in navigable water by virtue of it being "moored" to the platform, and, finally, that Plaintiff was aboard the vessel at the time of his injuries.

The factual development in the Record is insufficient to grant either parties' motion for summary judgment on the question of vessel negligence. While both parties concede that the Fast Rescue Craft was attached to the PERDIDO and suspended over the Gulf of Mexico, no further details are given about the Fast Rescue Craft, the Fast Rescue Craft's position on the PERDIDO, or the Fast Rescue Craft's relationship to the PERDIDO. Moreover, it is unclear from the Record

---

[120] *Alday*, 750 F.2d at 376 (1985).

exactly where Plaintiff Seals was at the time he fell from the ladder: whether he was on the PERDIDO platform or the Fast Rescue Craft. That fact and other related facts could be important in determining whether Seals's claim for vessel negligence can be maintained.

On the present Record, the Court cannot definitively state if the Fast Rescue Craft should be considered a vessel, as Plaintiff claims, or an "appurtenance," as Defendant claims. While Defendant suggests that the recently decided case of *Riley v. Alexander/Ryan Marine Services Company*[121] is on point on the question of whether a lifeboat attached to a platform is a vessel for the purposes of the LHWCA, *Riley*, which in any event is non-binding authority, addressed the question of whether a platform is a vessel, not whether a lifeboat attached to a platform is a vessel. Additional briefing and submission of additional evidence by the parties would be needed before the Court could resolve this issue.

Finally, the Court notes that the question of a breach of a duty is a question of fact.[122] Absent overwhelming evidence of negligence such that no reasonable trier of fact could decide otherwise—evidence which is not present here—it would be inappropriate for this Court to find the Defendant liable for negligence prior to trial, as Plaintiff asks this Court to do in its Motion for Summary Judgment on Liability of Shell Offshore Company for Vessel Negligence.

### IV. Conclusion

For the foregoing reasons, the Court finds that disputed material facts regarding the question of whether Seals was the borrowed employee of Shell preclude summary judgment. Additionally,

---

[121] No. 3:12-CV-00158, 2013 WL 5774872.

[122] *Chavez v. Noble Drilling Corp.*, 567 F.2d 287, 289 (5th Cir. 1978) ("Whether a defendant has breached a duty owed is a question of fact . . . .").

the Court finds that disputed material facts regarding the location of the Fast Rescue Craft and the location of Seals at the time of the accident also preclude summary judgment. Accordingly,

**IT IS HEREBY ORDERED** that Defendant Shell's Motion for Summary Judgment,[123] Plaintiff Seals's Motion for Summary Judgment on Liability of Shell Offshore Company for Vessel Negligence,[124] and Defendant Shell's Cross-Motion for Summary Judgment[125] are **DENIED**.

**NEW ORLEANS, LOUISIANA**, this 30th day of March, 2014.

**NANNETTE JOLIVETTE BROWN**
**UNITED STATES DISTRICT JUDGE**

---

[123] Rec. Doc. 94.

[124] Rec. Doc. 96.

[125] Rec. Doc. 124.

28